The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AUXIER FINANCIAL GROUP LLC, | No. C 10-2070 MJP |
| Plaintiff, | DECLARATION OF GREGORY GREENE |
| v. | |
| JP MORGAN CHASE BANK, N.A.; Bank of America N.A. as Successor by Merger to LASALLE BANK N.A. as TRUSTEE for Washington Mutual Mortgage Pass-through Certificates WaMu Series 2007-OA4 Trust, and for Washington Mutual Mortgage Pass-Through Certificates MWALT Series 2007 OC-1 Trust, | |
| Defendants. | |

I, Gregory Greene, declare and state as follows:

1.   ***Identity of Declarant.***  I am one of the owners of record of the property having a common address of 2525 Center Road, Everett, Washington 989024, and identified by tax parcel number 00538000016202 (the "Main Property"). Mr. Sellars and I also have an interest in vacant parallel property at the same address through a company known as LB Enterprises, and that property has a tax parcel number of 00538000016201 (the "Vacant Property"). I have personal knowledge of the facts stated in this Declaration and to the best of my knowledge they are and correct. If called as a witness, I would be competent to testify to these matters.

DECLARATION OF GREGORY GREENE (C10-2070 MJP) — 1
DWT 18425551v2 0036234-000065

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

2.   ***Ownership of the Main Property.***  On or about July 7, 2006, Joseph T. Sellars and I acquired the Main Property via a Trustee deed recorded in Snohomish County under auditor number 200607070442. A true and correct copy of that quitclaim deed is attached hereto as Exhibit A.

3.   ***Washington Mutual Loan.***  On or about February 23, 2007, Mr. Sellars borrowed $298,000 from Washington Mutual Bank, FA ("WaMu") (the "Loan"), and secured the Loan with the Main Property via a Deed of Trust, to which I was a party. The Deed of Trust securing the Loan was recorded in Snohomish County under auditor number 200702270788. A true and correct copy of that Deed of Trust is attached hereto as Exhibit B.

4.   ***Transfer of Future Interest to IBB&A.***  On March 19, 2009, Mr. Sellars and I entered into a Residential Real Estate Purchase and Sale Agreement (the "Sale Agreement") with International Business Brokers & Affiliates ("IBB&A").  A true and correct copy of the Sale Agreement is attached hereto as Exhibit C. My intent in entering the Sale Agreement was that IBB&A would satisfy Mr. Sellars's and my obligations under the Loan by March 2010.  In short, I simply wanted to put my ownership of the Main Property behind me, so I could move on to other projects. Once IBB&A paid the Loan in full, we would transfer our interest in the Main Property to IBB&A. Until IBB&A satisfied the Loan in full, IBB&A agreed to fund the monthly mortgage payments on the Loan; it was also entitled to any income generated by the Main Property and agreed to manage the Main Property. I did not intend to transfer any ownership interest in the Main Property until IBB&A satisfied the Loan in full, and this is evidenced in the Sale Agreement by the "Possession Date" being "[u]pon satisfaction of underlying debt." I did not inform WaMu or JPMorgan Chase Bank, N.A. about this conditional future transfer of my interest in the Main Property.

5.   ***Memorandum of Contract.***  On April 14, 2009, I signed a document titled Memorandum of Contract, which was subsequently recorded in Snohomish County under auditor number 200904200647. The Memorandum of Contract references an "unrecorded Contract for Sale and Purchase of Property" dated March 19, 2009. The document referenced is

DECLARATION OF GREGORY GREENE (C10-2070 MJP) — 2
DWT 18425551v2 0036234-000065

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1   the Sale Agreement identified above in paragraph 4. A true and correct copy of the

2   Memorandum of Contract is attached hereto as Exhibit D.

3       6.   ***Extension of Time to IBB&A.***  In March 2010, Mr. Sellars and I entered into an

4   Amendment to Purchase & Sales Agreement (the "Amendment"), which modified the Sale

5   Agreement. A true and correct copy of the Amendment is attached hereto as Exhibit E. Under

6   the terms of the Amendment, Mr. Sellars and I extended the deadline for IBB&A to satisfy the

7   debt secured by the Deed of Trust, and obtain a deed of reconveyance, by March 31, 2010.

8   That agreement was modified by someone else—neither I nor Mr. Sellars, whose handwriting I

9   recognize and am familiar with—to change the deadline to obtain the reconveyance until April

10  31 [sic], 2011.  Likewise, the closing date was adjusted to 90 days after our receipt of an

11  acceptable workout or after the recording of a Reconveyance of the WaMu Deed of Trust

12  (identified above in paragraph 3).  The intent of the Sale Agreement remained the same—

13  IBB&A would satisfy the Loan so that the lender would reconvey the Deed of Trust, and we

14  would subsequently transfer our interest in the Main Property to IBB&A.

15      7.   ***Auxier Financial Group, LLC.***  Mr. Sellars and I entered into the Sale

16  Agreement and Amendment with IBB&A, without meeting any of the principals of IBB&A or

17  anyone associated with the company. I was introduced to IBB&A by a real estate associate of

18  mine, "Bird Dog" Bill, who I sometimes do business with.  On March 19, 2009, I met with Bird

19  Dog Bill and his escrow agent to sign the Sale Agreement (referenced in paragraph 4).  At no

20  time during these negotiations did anyone at IBB&A represent that we were actually doing

21  business with Auxier Financial Group, LLC.

22      8.   ***Meeting with Mr. Auxier.***  About six months ago, Josh Auxier contacted me

23  claiming he was the rightful owner of the Main Property. At the same time, Mr. Auxier asked

24  me to sign a quitclaim deed transferring my interest in the Main Property to him. I refused to

25  gratuitously give him my property, and told Mr. Auxier to make me an offer if he wanted to

26  purchase my interest in the Main Property. Mr. Auxier subsequently offered me $1,000 for my

27

DECLARATION OF GREGORY GREENE (C10-2070 MJP) — 3
DWT 18425551v2 0036234-000065

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200  ·  1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150  ·  Fax: (206) 757-7700

1  interest in the Main Property, but I declined his offer, as inadequate for the property, as we paid

2  $217,796 for the property in 2006.

3      9.    ***Status of WaMu Loan.***  As of the date of the filing of this declaration, to my

4  knowledge neither IBB&A nor Auxier Financial Group (nor any other entity) has satisfied the

5  Loan in full or obtained a reconveyance of the Deed of Trust to which I am a party for the Main

6  Property.  As a result, the Sales Agreement did not close and Mr. Sellars and I retained our full

7  ownership interest in the Main Property.

8      10.    ***Present Ownership of the Main Property.***  Because IBB&A did not (and

9  certainly not Auxier Financial) satisfy the requirements of the Sale Agreement or the

10  Amendment, neither contract was fulfilled and the deal died.  As a result, Mr. Sellars and I are

11  presently the owners of the Main Property.

12      11.    ***Present Ownership of the Vacant Property.***  I also had a Purchase and Sale

13  Agreement with IBB&A as to the Vacant Property, which was expressly contingent on the

14  completion of the sale on the Main Property.  A copy of the Purchase and Sale Agreement for

15  the Vacant Property is attached as Exhibit F, and the contingency is on page 6.  I provided a

16  Warranty Deed for the Vacant Property to be recorded once the contingency in the Purchase

17  and Sale Agreement—i.e., sale of the Main Property—was completed.  IBB&A appears to

18  have recorded that Warranty Deed, and taken out a mortgage on the Vacant Property, despite

19  its failure to complete the requirements of the Purchase and Sale Agreement on the Property.

20  The Warranty Deed is attached to this declaration as Exhibit G.  The new and improper Deed of

21  Trust recorded by Plaintiff (purporting to do business as IBB&A) is attached as Exhibit H, and

22  was obtained from the Snohomish County Recorder's website, here:

23  http://198.238.192.100/docimage.asp?id=jAwOzM1%21o%03%13M%21b%21%21AK%21%

24  21jYwMH%21%2FgTA1M&ms=0&cabinet=opr&pg=&id2=S8yNmKu3j%03%0FN8%21wlx

25  A%21KDA5Q%214Qgi8yM.  Because the sale on the Main Property never closed, then

26  pursuant to the Purchase and Sale Agreement on the Vacant Property, IBB&M's interest in the

27  Vacant Property is "void."  I never authorized IBB&M to record the Warranty Deed and

DECLARATION OF GREGORY GREENE (C10-2070 MJP) — 4
DWT 18425551v2 0036234-000065

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1  certainly never authorized IBB&A to borrow money against the property, and I believe I am

2  entitled to parcel 00538000016201 and have the lien removed.

3        I declare under penalty of perjury, under the laws of the State of Washington that the

4  foregoing is true and correct.

5        DATED this 28th day of October, 2011, at Lake Stevens Washington.

6

7                                         Greg Greene

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF GREGORY GREENE (C10-2070 MJP) — 5
DWT 18425551v2 0036234-000065

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1

## <u>CERTIFICATE OF SERVICE</u>

2

3          I hereby certify that on December 8, 2011, I electronically filed the foregoing with the
Clerk of the Court using the CM/ECF system which will send notification of such filing to the
4    following:

5    •   **Edward L. Mueller**
        elm@mueller
6

7

8          DATED at Seattle, Washington this 8th day of December, 2011.

9

10                                   By  _/s/ Matthew Sullivan_____
                                         Matthew Sullivan, WSBA #40873
11                                       1201 Third Avenue, Suite 2200
                                         Seattle, Washington  98101-3045
12                                       Telephone: (206) 757-8257
                                         Fax: (206) 757-7257
13                                       E-mail: matthewsullivan@dwt.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

MIRZOYAN DECLARATION  (C10-2070 MJP) - 3
DWT 18512517v2 0036234-000065

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

# Exhibit A

Return Name & Address

Joe Sellars
8005 8th ST SE
Everett WA 98205

2007022100632      3    PGS
02/21/2007 2:17pm $34.00
SNOHOMISH COUNTY, WASHINGTON

**Document Title(s)**

Quit Claim

**Reference Number(s) of Related Document(s)**

_____

_____                    Additional Reference #'s on Page_____

**Grantor(s)**

LB Enterprises

_____                    Additional Grantors on Page _____

**Grantee(s)**

Joseph T. Sellars          Gregory Greene

_____                    Additional Grantees on Page _____

**Legal Description (abbreviated form: ie.Lot/Block/Plat or Section/Township/Range)**

E. 85 FT LOT 162 PLAT of PAINE FIELD No 3

_____                    Complete Legal on Page _____

**Assessor's Property Tax Parcel/Account Number**

00538000016202

_____                    Additional Parcel #'s on Page _____

The Auditor/Recorder will rely on the information provided on this form. The responsibility for the
accuracy of the indexing information is that of the document preparer.

491163

No. 3446579   2/21/2007 2:03 PM
Thank you for your payment.
B3                                    18.00

AFTER RECORDING MAIL TO:

## QUIT CLAIM DEED

THE GRANTOR(S): *L. B. Enterprises*

for and in consideration of *ten dollars and other good and valuable consideration*

in hand paid, conveys and quit claims to *Joseph T. Sellars and GREG GREENE*

the following described real estate, situated in the County of *Sno*, State of Washington:

*SEE  ATTACHED  LEGAL  DESCRIPTION*

Tax Parcel Number(s): *0053890.00.16 202*

Dated: *February 21, 2007*

State of *Washington*

County of *Snohomish*                }ss.

I certify that I know or have satisfactory evidence that    is/are the person(s) who appeared before me, and said person(s) acknowledged that he/she/they signed this instrument and acknowledged it to be his/her/their free and voluntary act of such party(ies) for the uses and purposes mentioned in this instrument.

Dated: *February 21, 2007*

*BRANDON SHIMIZU*
Notary name printed or typed:
Notary Public in and for the State of Washington
Residing at *Bellevue, WA*
My appointment expires *1-20-09*

Notary Public
State of Washington
BRANDON T SHIMIZU
My Appointment Expires Jan 20, 2009

LPB 12-05

200607070442.0

EXHIBIT

RECORDING REQUESTED BY

After recording, return to:
8005 5th St SE
Everett, WA 98205

Forward Tax Statements to
Address listed above
Doc ID # 0009419759332005N
File No   2006 - 463

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## Trustee's Deed

The GRANTOR, ReconTrust Company, N.A., as present Trustee under that Deed of Trust (defined below) in consideration of the premises and payment recited below, hereby grants and conveys, without warranty, to LB ENTERPRISES & FOUNDATION FINANCIAL PARTNERS LLC FOR SECURITY PURPOSES ONLY, as GRANTEE, all real property (the property), situated in the county of  Snohomish, state of Washington, described as follows.

Tax Parcel No   005380-000-162-02
THE EAST 85 FEET OF LOT 162 PLAT OF PAINE FIELD NO 3 ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 12 OF PLATS PAGES 110 AND 111 IN SNOHOMISH COUNTY WASHINGTON

RECITALS
1 This conveyance is made pursuant to the powers, including the power of sale, conferred upon the Grantee by the certain Deed of Trust between DARIN R MCDONALD, AS HIS SEPARATE ESTATE, as Grantor, to ECOM TITLE AGENCY INC , as Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC , Beneficiary, dated 05/25/2005 recorded 06/20/2005, under Auditor's/Recorder's No  200506200143, records of Snohomish County, Washington

*Form wa_trsdeed (01/02)*

# Exhibit B

Return To

WASHINGTON MUTUAL BANK   FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

```
2007022702788                   26  PGS
02/27/2007 11 53am $58 00
SNOHOMISH COUNTY, WASHINGTON
```

Assessor's Parcel or Account Number   00538000016202
Abbreviated Legal Description

Portion of Lot 162, Paine Field 3, 12/110.

[Include lot block and plat or section township and range] Full legal description located on page 3
Trustee   CHICAGO TITLE INSURANCE CO

——————————— [Space Above This Line For Recording Data] ———————————

ZWAT
M39  **CHICAGO**

5425844

# DEED OF TRUST

3013311174-048

26/58-

INSURED BY
CHICAGO TITLE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21  Certain rules regarding the usage of words used in this document are also provided in Section 16

(A) "Security Instrument" means this document, which is dated FEBRUARY 22, 2007 together with all Riders to this document

(B) "Borrower" is JOSEPH T SELLARS ,A MARRIED PERSON and Greg Greene,
a single person

Borrower is the trustor under this Security Instrument
(C) "Lender" is WASHINGTON MUTUAL BANK, FA

WASHINGTON-Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3048 1/01

-6(WA) (0012)

Page 1 of 15           Initials
VMP MORTGAGE FORMS - (800)521-7291

Lender is a  FEDERAL SAVINGS BANK
organized and existing under the laws of  THE UNITED STATES OF AMERICA
Lender's address is  2273 N  GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV
89014
Lender is the beneficiary under this Security Instrument

(D) "Trustee" is  CHICAGO TITLE INSURANCE CO

(E) "Note" means the promissory note signed by Borrower and dated  FEBRUARY 22, 2007
The Note states that Borrower owes Lender  TWO HUNDRED NINETY EIGHT THOUSAND AND
00/100                                                                                                          Dollars
(U S $   298,000 00   ) plus interest Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  MARCH 01, 2037

(F) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property"

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower  The
following Riders are to be executed by Borrower [check box as applicable]

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account  Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers

(L) "Escrow Items" means those items that are described in Section 3

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for (i) damage to, or destruction of, the Property, (ii) condemnation or
other taking of all or any part of the Property, (iii) conveyance in lieu of condemnation, or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U S C  Section 2601 et seq )
and its implementing regulation, Regulation X (24 C F R  Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter  As used in this Security Instrument, "RESPA" refers to all requirements and

Initials

-6(WA) (0012)                              Page 2 of 15                              Form 3048 1/01

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                                     of   SNOHOMISH
            [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

THE EAST 85 FEET OF LOT 162, PAINE FIELD NO 3, ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 12, OF PLATS, PAGE 110, RECORDS OF SNOHOMISH COUNTY, WASHINGTON SITUATE IN THE COUNTY OF SNOHOMISH, STATE OF WASHINGTON

Parcel ID Number   00538000016202                          which currently has the address of
2525 CENTER RD                                                                        [Street]
EVERETT                                              [City], Washington   98204          [Zip Code]
("Property Address")

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property All replacements and additions shall also be covered by this Security Instrument All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property

UNIFORM COVENANTS Borrower and Lender covenant and agree as follows

1   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

-6(WA) (0012)                        Page 3 of 15                    Initials                Form 3048 1/01

Note and any prepayment charges and late charges due under the Note Borrower shall also pay funds for Escrow Items pursuant to Section 3 Payments due under the Note and this Security Instrument shall be made in U S currency However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity, or (d) Electronic Funds Transfer

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15 Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument

2 **Application of Payments or Proceeds** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority (a) interest due under the Note, (b) principal due under the Note, (c) amounts due under Section 3 Such payments shall be applied to each Periodic Payment in the order in which it became due Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments

3 **Funds for Escrow Items** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property, (b) leasehold payments or ground rents on the Property, if any, (c) premiums for any and all insurance required by Lender under Section 5, and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10 These items are called "Escrow Items " At origination or at any time during the

Initials

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time Any such waiver may only be in writing In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9 If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender

4 Charges, Liens Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3

-6(WA) (0012)                         Page 5 of 15                Initials *DF*              Form 3048 1/01

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement, (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan

5 **Property Insurance** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires What Lender requires pursuant to the preceding sentences can change during the term of the Loan The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably Lender may require Borrower to pay, in connection with this Loan, either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense Lender is under no obligation to purchase any particular type or amount of coverage Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee Lender shall have the right to hold the policies and renewal certificates If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender Lender may make proof of loss if not made promptly by Borrower Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was

-6(WA) (0012)                    Page 6 of 15                 Initials                  Form 3048 1/01

required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower Such insurance proceeds shall be applied in the order provided for in Section 2

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim The 30-day period will begin when the notice is given In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due

6  Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control

7.  Preservation, Maintenance and Protection of the Property, Inspections  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration

Lender or its agent may make reasonable entries upon and inspections of the Property If it has reasonable cause, Lender may inspect the interior of the improvements on the Property Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause

Initials

8 Borrower's Loan Application  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence

9  Protection of Lender's Interest in the Property and Rights Under this Security Instrument  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property  Lender's actions can include, but are not limited to  (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court, and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing

10  Mortgage Insurance  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance  If Lender required Mortgage Insurance as a condition of making the Loan, and

Initials

Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed  Borrower is not a party to the Mortgage Insurance

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums)

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law  These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination

11  Assignment of Miscellaneous Proceeds, Forfeiture  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened  During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair

Initials

market value of the Property immediately before the partial taking, destruction, or loss in value Any balance shall be paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2

12 Borrower Not Released, Forbearance By Lender Not a Waiver Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy

13 Joint and Several Liability, Co-signers, Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer") (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument, (b) is not personally obligated to pay the sums secured by this Security Instrument, and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender

14. Loan Charges Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law

-6(WA) (0012)                        Page 10 of 15                        Initials _____        Form 3048 1/01

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note) Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge

15. Notices All notices given by Borrower or Lender in connection with this Security Instrument must be in writing Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender Borrower shall promptly notify Lender of Borrower's change of address If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure There may be only one designated notice address under this Security Instrument at any one time Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument

16. Governing Law, Severability, Rules of Construction This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision

As used in this Security Instrument (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender, (b) words in the singular shall mean and include the plural and vice versa, and (c) the word "may" gives sole discretion without any obligation to take any action

17. Borrower's Copy Borrower shall be given one copy of the Note and of this Security Instrument

18. Transfer of the Property or a Beneficial Interest in Borrower As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law

If Lender exercises this option, Lender shall give Borrower notice of acceleration The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

**19  Borrower's Right to Reinstate After Acceleration**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of  (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument, (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate, or (c) entry of a judgment enforcing this Security Instrument  Those conditions are that Borrower (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred, (b) cures any default of any other covenants or agreements, (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity, or (d) Electronic Funds Transfer  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred  However, this right to reinstate shall not apply in the case of acceleration under Section 18

**20.  Sale of Note, Change of Loan Servicer, Notice of Grievance**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20

**21  Hazardous Substances**  As used in this Section 21  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials, (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection, (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law, and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property

Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products)

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law Nothing herein shall create any obligation on Lender for an Environmental Cleanup

NON-UNIFORM COVENANTS   Borrower and Lender further covenant and agree as follows

22. Acceleration, Remedies  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise) The notice shall specify  (a) the default, (b) the action required to cure the default, (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured, and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future  The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines  Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale Lender or its designee may purchase the Property at any sale

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees, (b) to all sums secured by this Security Instrument, and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

**ZWA2**

23 **Reconveyance** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance

24 **Substitute Trustee** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law

25 **Use of Property** The Property is not used principally for agricultural purposes

26 **Attorneys' Fees** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it

Witnesses



_____    _____ (Seal)
                                                        -Borrower
                             JOSEPH T SELLARS

_____    _____ (Seal)
                             Greg Greene              -Borrower

_____    _____
         (Seal)                       (Seal)
       -Borrower                    -Borrower

_____    _____
         (Seal)                       (Seal)
       -Borrower                    -Borrower

_____    _____
         (Seal)                       (Seal)
       -Borrower                    -Borrower

STATE OF WASHINGTON                                           } ss
County of    SNOHOMISH
      On this day personally appeared before me    JOSEPH T SELLARS

*and Greg Greene*

to me known to be the individual(s) described in and who executed the within and foregoing
instrument, and acknowledged that he/she/they signed the same as his/her/their free and voluntary
act and deed, for the uses and purposes therein mentioned
      GIVEN under my hand and official seal this  23rd  day of *February 2007*

                                          Notary Public in and for the State of Washington, residing at
                                          *Snohomish*
                                          My Appointment Expires on  03/29/09

Initials _____

LGLD

LEGAL DESCRIPTION

3013311174-048

THE EAST 85 FEET OF LOT 162, PAINE FIELD NO 3, ACCORDING TO THE
PLAT THEREOF, RECORDED IN VOLUME 12, OF PLATS, PAGE 110, RECORDS
OF SNOHOMISH COUNTY, WASHINGTON SITUATE IN THE COUNTY OF
SNOHOMISH, STATE OF WASHINGTON

Unofficial Document

RMTA
M39

3013311174-048

# ADJUSTABLE RATE RIDER

### (12-MTA Index - Payment and Rate Caps)

3013311174

THIS ADJUSTABLE RATE RIDER is made this ___22ND___ day of ___FEBRUARY, 2007___, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to ___WASHINGTON MUTUAL BANK, FA___ (the "Lender") of the same date and covering the property described in the Security Instrument and located at

___2525 CENTER RD, EVERETT, WA  98204___
(PROPERTY ADDRESS)

**THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN ___115%___ OF THE ORIGINAL AMOUNT (OR $___342,700.00___). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.**

**ADDITIONAL COVENANTS** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows

**A   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    Interest will be charged on unpaid Principal until the full amount of Principal has been paid  Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of the Note, I will pay interest at a yearly rate of ___8 883___ %  Thereafter until the first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate of ___2.250___ %  The interest rate I will pay will thereafter change in accordance with Section 4 of the Note

32843 (11-01)                         Page 1 of 6                         LRD02USA (VERSION 1 0)

3013311174

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the <u>1ST</u> day of <u>APRIL, 2007</u>, and on that day every month thereafter  Each such day is called a "Change Date"

**(B) The Index**

On each Change Date, my interest rate will be based on an Index  The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H 15)" (the "Monthly Yields")  The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index"

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information  The Note Holder will give me notice of this choice

**(C) Interest Rate Change**

Before each Change Date, the Note Holder will calculate my new interest rate by adding <u>THREE AND 90/100</u> percentage points <u>3.900</u> % ("Margin") to Current Index  The Note Holder will then round the result of this addition to the nearest one thousandth of one percentage point (0 001%)  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date  In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined  The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available)  The difference will be rounded to the next higher 1/8 of 1%

**(D) Interest Rate Limit**

My interest rate will never be greater than <u>11.300</u> % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer

**(E) Payment Change Dates**

Effective every year commencing <u>APRIL 01, 2008</u>, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the

32843 (11-01)                                      Page 2 of 6                              LRD02USB (VERSION 1 0)



3013311174

amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments  The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note

**(F)  Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying  This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument

**(G)  Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments  For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate  For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note

**(H)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to __115%____ of the principal amount original borrowed  In the event my unpaid Principal would otherwise exceed that _115%____ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation  The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments

**(I)  Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F)

**(J)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice



RMT 2

3013311174

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

**B   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows

Transfer of the Property or a Beneficial Interest in Borrower   As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser   If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument   However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law   Lender also shall not exercise this option if  (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer   Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument   Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower

3013311174

If Lender exercises this option, Lender shall give Borrower notice of acceleration  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

32843 (11-01)                    Page 5 of 6                    LRD02USE (VERSION 1 0)

3013311174

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed



_____          _____
JOSEPH T SELLARS                          Greg Greene

_____          _____

_____          _____

_____          _____

32843 (11-01)                    Page 6 of 6                    LRD02USF (VERSION 1 0)

# 1-4 FAMILY RIDER

### (Assignment of Rents)

3013311174-048

57US
M39

THIS 1-4 FAMILY RIDER is made this **22ND** day of **FEBRUARY** **2007**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

**WASHINGTON MUTUAL BANK, FA**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at

**2525 CENTER RD, EVERETT, WA 98204**

[Property Address]

**1-4 FAMILY COVENANTS** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to and remain a part of the

MULTISTATE 1-4 FAMILY RIDER—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3170 1/01

Page 1 of 4                                                                    Initials

-57R (0008)                    VMP MORTGAGE FORMS - (800)521-7291



Property covered by the Security Instrument All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property"

**B   USE OF PROPERTY, COMPLIANCE WITH LAW** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property

**C   SUBORDINATE LIENS** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission

**D   RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5

**E   "BORROWER'S RIGHT TO REINSTATE" DELETED** Section 19 is deleted

**F   BORROWER'S OCCUPANCY** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted

**G   ASSIGNMENT OF LEASES** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold

**H. ASSIGNMENT OF RENTS, APPOINTMENT OF RECEIVER, LENDER IN POSSESSION** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only

Initials _____

If Lender gives notice of default to Borrower (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument, (ii) Lender shall be entitled to collect and receive all of the Rents of the Property, (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant, (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument, (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received, and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full

 I   **CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument

—57R (0008)                          Page 3 of 4                    Initials _____          Form 3170 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)    _____ (Seal)
-Borrower                    -Borrower
                             JOSEPH T SELLARS

_____ (Seal)    _____ (Seal)
-Borrower                    -Borrower
                             Greg Greene

_____ (Seal)    _____ (Seal)
-Borrower                    -Borrower

_____ (Seal)    _____ (Seal)
-Borrower                    -Borrower

-57R (0008)            Page 4 of 4            Form 3170 1/01

Unofficial Document

# Exhibit C

Form 21
Residential Purchase & Sale Agreement
Revised 1/09
Page 1 of 5

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## RESIDENTIAL REAL ESTATE PURCHASE AND SALE AGREEMENT
### SPECIFIC TERMS

1. **Date:** March 19, 2009      **MLS No.:** FSBO

2. **Buyer:** JBB & A

3. **Seller:** Joseph Sellars & Gregory Greene

4. **Property:** Tax Parcel No(s).: 00538000016202    (    Snohomish    County)
   Street Address: 2525 Center Road, Everett     Washington 98204
   Legal Description: Attached as Exhibit A

5. **Included Items:** ☑ stove/range; ☑ refrigerator; ☐ washer; ☐ dryer; ☐ dishwasher; ☐ hot tub; ☐ fireplace insert;
   ☐ wood stove; ☐ satellite dish; ☐ security system; ☐ other

6. **Purchase Price:**

7. **Earnest Money:** (To be held by ☐ Selling Broker; ☐ Closing Agent)
   Personal Check.
   Note
   Other ( _____ )

8. **Default:** (check only one) ☐ Forfeiture of Earnest Money; ☐ Seller's Election of Remedies

9. **Disclosures in Form 17:** Buyer will ☐ , will not ☐ have a remedy for Seller's negligent errors, inaccuracies,
   or omissions in Form 17

10. **Title Insurance Company:** Chicago Title

11. **Closing Agent:** ☐ a qualified closing agent of Buyer's choice; ☑ First Choice Escrow

12. **Closing Date:** 03/27/2009

13. **Possession Date:** ☐ on Closing; ☑ Other Upon satisfaction of underlying debt

14. **Offer Expiration Date:** 03/20/2009

15. **Services of Closing Agent for Payment of Utilities:** ☐ Requested (attach NWMLS Form 22K); ☐ Waived

16. **Charges and Assessments Due After Closing:** ☐ assumed by Buyer; ☐ prepaid in full by Seller at Closing

17. **Agency Disclosure:** Selling Licensee represents ☐ Buyer; ☐ Seller; ☐ both parties; ☐ neither party
    Listing Agent represents ☐ Seller; ☐ both parties

18. **Addenda:** 34(Addendum);

---

| | | | |
|---|---|---|---|
| _(Buyer's Signature)_ | 03/19/2009 Date | _(Seller's Signature)_ | 03/19/2009 Date |
| _(Buyer's Signature)_ | 3-19-09 Date | _(Seller's Signature)_ | 03/19/2009 Date |

Buyer's Address
21029 W. Richmond Rd.
City, State, Zip
425-319-0549
Phone     Fax
heiv7@yahoo.com
Buyer's E-mail Address

Seller's Address
8005 8th St SE
Everett, WA 98258
City, State, Zip
425-280-5363    888-653-8130
Phone     Fax
Seller's E-mail Address

Selling Broker     MLS Office No.

Listing Broker     MLS Office No.

Selling Licensee (Print)     MLS LAG No

Listing Agent (Print)     MLS LAG No

Phone     Fax

Phone     Fax

Form 21
Residential Purchase & Sale Agreement
Revised 1/09
Page 2 of 5

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## RESIDENTIAL REAL ESTATE PURCHASE AND SALE AGREEMENT
### GENERAL TERMS
*(continued)*

a. **Purchase Price.** Buyer agrees to pay to Seller the Purchase Price, including the Earnest Money, in cash at Closing, 1
unless otherwise specified in this Agreement. Buyer represents that Buyer has sufficient funds to close this sale in 2
accordance with this Agreement and is not relying on any contingent source of funds, including funds from loans, the 3
sale of other property, gifts, retirement, or future earnings, except to the extent otherwise specified in this Agreement. 4

b. **Earnest Money.** Buyer agrees to deliver the Earnest Money within 2 days after mutual acceptance of this Agreement 5
to Selling Licensee who will deposit any check to be held by Selling Broker, or deliver any Earnest Money to be held 6
by Closing Agent, within 3 days of receipt or mutual acceptance, whichever occurs later. If the Earnest Money is held 7
by Selling Broker and is over $10,000.00 it shall be deposited into an interest bearing trust account in Selling Broker's 8
name provided that Buyer completes an IRS Form W-9. Interest, if any, after deduction of bank charges and fees, 9
will be paid to Buyer. Buyer agrees to reimburse Selling Broker for bank charges and fees in excess of the interest 10
earned, if any. If the Earnest Money held by Selling Broker is over $10,000.00 Buyer has the option to require Selling 11
Broker to deposit the Earnest Money into the Housing Trust Fund Account, with the interest paid to the State 12
Treasurer, if both Seller and Buyer so agree in writing. If the Buyer does not complete an IRS Form W-9 before 13
Selling Broker must deposit the Earnest Money or the Earnest Money is $10,000.00 or less, the Earnest Money shall 14
be deposited into the Housing Trust Fund Account. Selling Broker may transfer the Earnest Money to Closing Agent 15
at Closing. If all or part of the Earnest Money is to be refunded to Buyer and any such costs remain unpaid, the 16
Selling Broker or Closing Agent may deduct and pay them therefrom. The parties instruct Closing Agent to (1) 17
provide written verification of receipt of the Earnest Money and notice of dishonor of any check to the parties and 18
Licensees at the addresses and/or fax numbers provided herein, and (2) commence an interpleader action in the 19
county in which the Property is located within 30 days of a party's demand for the Earnest Money unless the parties 20
agree otherwise in writing. The parties authorize the party commencing an interpleader action to deduct up to 21
$250.00 for the costs thereof. 22

c. **Included Items.** Any of the following items, including items identified in Specific Term No. 5 if the corresponding box 23
is checked, located in or on the Property are included in the sale: built-in appliances; wall-to-wall carpeting; curtains, 24
drapes and all other window treatments; window and door screens; awnings; storm doors and windows; installed 25
television antennas; ventilating, air conditioning and heating fixtures; trash compactor; fireplace doors, gas logs and 26
gas log lighters; irrigation fixtures; electric garage door openers and remotes; water heaters; installed electrical 27
fixtures; lighting fixtures; shrubs, plants and trees planted in the ground, all bathroom and other fixtures, and all 28
associated operating equipment. If any of the above Included Items are leased or encumbered, Seller agrees to 29
acquire and clear title at or before Closing. 30

d. **Condition of Title.** Unless otherwise specified in this Agreement, title to the Property shall be marketable at Closing. 31
The following shall not cause the title to be unmarketable: rights, reservations, covenants, conditions and restrictions, 32
presently of record and general to the area; easements and encroachments not materially affecting the value of or 33
unduly interfering with Buyer's reasonable use of the Property; and reserved oil and/or mining rights. Monetary 34
encumbrances or liens not assumed by Buyer, shall be paid or discharged by Seller on or before Closing. Title shall 35
be conveyed by a Statutory Warranty Deed. If this Agreement is for conveyance of a buyer's interest in a Real 36
Estate Contract, the Statutory Warranty Deed shall include a buyer's assignment of the contract sufficient to convey 37
after acquired title. 38

e. **Title Insurance.** Seller authorizes Buyer's lender or Closing Agent, at Seller's expense, to apply for the then-current 39
ALTA form of Homeowner's Policy of Title Insurance for One-to-Four Family Residence, from the Title Insurance 40
Company. If Seller previously received a preliminary commitment from a Title Insurance Company that Buyer 41
declines to use, Buyer shall pay any cancellation fees owing to the original Title Insurance Company. Otherwise, the 42
party applying for title insurance agrees to pay any title cancellation fee, in the event such a fee is assessed. If the 43
Title Insurance Company selected by the parties will not issue a Homeowner's Policy for the Property, the parties 44
agree that the Title Insurance Company shall instead issue the then-current ALTA standard form Owner's Policy. The 45
Title Insurance Company shall send a copy of the preliminary commitment to Seller, Listing Agent, Buyer and Selling 46
Licensee. The preliminary commitment, and the title policy to be issued, shall contain no exceptions other than the 47
General Exclusions and Exceptions in the Policy and Special Exceptions consistent with the Condition of Title herein 48
provided. If title cannot be made so insurable prior to the Closing Date, then as Buyer's sole and exclusive remedy, 49
the Earnest Money shall, unless Buyer elects to waive such defects or encumbrances, be refunded to the Buyer, less 50
any unpaid costs described in this Agreement, and this Agreement shall thereupon be terminated. Buyer shall have 51
no right to specific performance or damages as a consequence of Seller's inability to provide insurable title. 52

Initials: BUYER: _IBGW_ DATE: _3-19-09_ SELLER: _____ DATE: _3-19-09_ 53
BUYER. _____ DATE: _____ SELLER: _____ DATE: _3-19-09_ 54

Form 21
Residential Purchase & Sale Agreement
Revised 1/09
Page 3 of 5

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

**RESIDENTIAL REAL ESTATE PURCHASE AND SALE AGREEMENT**
**GENERAL TERMS**
*(continued)*

**f. Closing and Possession.** This sale shall be closed by the Closing Agent on the Closing Date. If the Closing Date falls 55
on a Saturday, Sunday, legal holiday as defined in RCW 1.16.050, or day when the county recording office is closed, 56
the Closing Agent shall close the transaction on the next day that is not a Saturday, Sunday, legal holiday, or day when 57
the county recording office is closed. "Closing" means the date on which all documents are recorded and the sale 58
proceeds are available to Seller. Seller shall deliver keys and garage door remotes to Buyer on the Closing Date or on 59
the Possession Date, whichever occurs first. Buyer shall be entitled to possession at 9:00 p.m. on the Possession 60
Date. Seller agrees to maintain the Property in its present condition, normal wear and tear excepted, until the Buyer is 61
entitled to possession. If possession transfers at a time other than Closing, the parties agree to execute NWMLS Form 62
65A (Rental Agreement/Occupancy Prior to Closing) or NWMLS Form 65B (Rental Agreement/Seller Occupancy After 63
Closing) (or alternative rental agreements) and are advised of the need to contact their respective insurance 64
companies to assure appropriate hazard and liability insurance policies are in place, as applicable. 65

**g. Section 1031 Like-Kind Exchange.** If either Buyer or Seller intends for this transaction to be a part of a Section 1031 66
like-kind exchange, then the other party agrees to cooperate in the completion of the like-kind exchange so long as the 67
cooperating party incurs no additional liability in doing so, and so long as any expenses (including attorneys' fees and 68
costs) incurred by the cooperating party that are related only to the exchange are paid or reimbursed to the coopera- 69
ting party at or prior to Closing. Notwithstanding the Assignment paragraph of this Agreement, any party completing a 70
Section 1031 like-kind exchange may assign this Agreement to its qualified intermediary or any entity set up for the 71
purposes of completing a reverse exchange. 72

**h. Closing Costs and Prorations and Charges and Assessments.** Seller and Buyer shall each pay one-half of the 73
escrow fee unless otherwise required by applicable FHA or VA regulations. Taxes for the current year, rent, interest, 74
and lienable homeowner's association dues shall be prorated as of Closing. Buyer agrees to pay Buyer's loan costs, 75
including credit report, appraisal charge and lender's title insurance, unless provided otherwise in this Agreement. If 76
any payments are delinquent on encumbrances which will remain after Closing, Closing Agent is instructed to pay 77
such delinquencies at Closing from money due. or to be paid by, Seller. Buyer agrees to pay for remaining fuel in the 78
fuel tank if, prior to Closing, Seller obtains a written statement as to the quantity and current price from the supplier. 79
Seller agrees to pay all utility charges, including unbilled charges. Unless waived in Specific Term No. 15, Seller and 80
Buyer request the services of Closing Agent in disbursing funds necessary to satisfy unpaid utility charges in 81
accordance with RCW 60.80 and Seller agrees to provide the names and addresses of all utilities providing service to 82
the Property and having lien rights (attach NWMLS Form 22K Identification of Utilities or equivalent). Buyer is advised 83
to verify the existence and amount of any local improvement district, capacity or impact charges or other assessments 84
that may be charged against the Property before or after Closing. Seller will pay such charges that are encumbrances 85
at the time of Closing, or that are or become due on or before Closing. Charges levied before Closing, but becoming 86
due after Closing shall be paid as agreed in Specific Term No. 16. 87

**i. Sale Information.** The Listing Agent or Selling Licensee is authorized to report this Agreement (including price and all 88
terms) to the Multiple Listing Service that published it and to its members, financing institutions, appraisers, and 89
anyone else related to this sale. Buyer and Seller expressly authorize all Closing Agents, appraisers, title insurance 90
companies, and others related to this Sale, to furnish the Listing Agent and/or Selling Licensee, on request, any and 91
all information and copies of documents concerning this sale. 92

**j. FIRPTA - Tax Withholding at Closing.** The Closing Agent is instructed to prepare a certification (NWMLS Form 22E 93
or equivalent) that Seller is not a "foreign person" within the meaning of the Foreign Investment In Real Property Tax 94
Act. Seller agrees to sign this certification. If Seller is a foreign person, and this transaction is not otherwise exempt 95
from FIRPTA, Closing Agent is instructed to withhold and pay the required amount to the Internal Revenue Service. 96

**k. Notices.** In consideration of the license to use this and NWMLS's companion forms and for the benefit of the Listing 97
Agent and the Selling Licensee as well as the orderly administration of the offer, counteroffer or this Agreement, the 98
parties irrevocably agree that unless otherwise specified in this Agreement, any notice required or permitted in, or 99
related to, this Agreement (including revocations of offers or counteroffers) must be in writing. Notices to Seller must 100
be signed by at least one Buyer and shall be deemed given only when the notice is received by Seller, by Listing 101
Agent or at the licensed office of Listing Agent. Notices to Buyer must be signed by at least one Seller and shall be 102
deemed given only when the notice is received by Buyer, by Selling Licensee or at the licensed office of Selling 103
Licensee. Actual receipt by Selling Licensee of a Form 17, Disclosure of Information on Lead-Based Paint and Lead- 104
Based Paint Hazards, Public Offering Statement or Resale Certificate, homeowners' association documents provided 105
pursuant to NWMLS Form 22D, or a preliminary commitment for title insurance provided pursuant to NWMLS 106

Initials: BUYER: _BB+A_ DATE: _3-19-09_ SELLER: _____ DATE: _3-19-09_ 107
         BUYER: _____ DATE: _____ SELLER: _____ DATE: _3-19-09_ 108

Form 21
Residential Purchase & Sale Agreement
Revised 1/09
Page 4 of 5

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## RESIDENTIAL REAL ESTATE PURCHASE AND SALE AGREEMENT
### GENERAL TERMS
*(continued)*

Form 22T shall be deemed receipt by Buyer. Selling Licensee and Listing Agent have no responsibility to advise of 109
receipt of a notice beyond either phoning the party or causing a copy of the notice to be delivered to the party's 110
address shown on this Agreement. Buyer and Seller must keep Selling Licensee and Listing Agent advised of their 111
whereabouts in order to receive prompt notification of receipt of a notice. 112

l. **Computation of Time.** Unless otherwise specified in this Agreement, any period of time measured in days and stated 113
in this Agreement shall start on the day following the event commencing the period and shall expire at 9:00 p.m. of the 114
last calendar day of the specified period of time. Except for the Possession Date, if the last day is a Saturday, Sunday 115
or legal holiday as defined in RCW 1.16.050, the specified period of time shall expire on the next day that is not a 116
Saturday, Sunday or legal holiday. Any specified period of 5 days or less shall not include Saturdays, Sundays or 117
legal holidays. If the parties agree that an event will occur on a specific calendar date, the event shall occur on that 118
date, except for the Closing Date, which, if it falls on a Saturday, Sunday, legal holiday as defined in RCW 1.16.050, 119
or day when the county recording office is closed, shall occur on the next day that is not a Saturday, Sunday, legal 120
holiday, or day when the county recording office is closed. If the parties agree upon and attach a legal description 121
after this Agreement is signed by the offeree and delivered to the offeror, then for the purposes of computing time, 122
mutual acceptance shall be deemed to be on the date of delivery of an accepted offer or counteroffer to the offeror, 123
rather than on the date the legal description is attached. Time is of the essence of this Agreement. 124

m. **Facsimile and E-mail Transmission.** Facsimile transmission of any signed original document, and retransmission of 125
any signed facsimile transmission, shall be the same as delivery of an original. At the request of either party, or the 126
Closing Agent, the parties will confirm facsimile transmitted signatures by signing an original document. E-mail trans- 127
mission of any document or notice shall not be effective unless the parties to this Agreement otherwise agree in writing. 128

n. **Integration.** This Agreement constitutes the entire understanding between the parties and supersedes all prior or 129
contemporaneous understandings and representations. No modification of this Agreement shall be effective unless 130
agreed in writing and signed by Buyer and Seller. 131

o. **Assignment.** Buyer may not assign this Agreement, or Buyer's rights hereunder, without Seller's prior written 132
consent, unless the parties indicate that assignment is permitted by the addition of "and/or assigns" on the line 133
identifying the Buyer on the first page of this Agreement. 134

p. **Default.** In the event Buyer fails, without legal excuse, to complete the purchase of the Property, then the following 135
provision, as identified in Specific Term No. 8, shall apply: 136

   i. **Forfeiture of Earnest Money.** That portion of the Earnest Money that does not exceed five percent (5%) of the 137
   Purchase Price shall be forfeited to the Seller as the sole and exclusive remedy available to Seller for such failure 138

   ii. **Seller's Election of Remedies.** Seller may, at Seller's option, (a) keep the Earnest Money as liquidated damages 139
   as the sole and exclusive remedy available to Seller for such failure, (b) bring suit against Buyer for Seller's actual 140
   damages, (c) bring suit to specifically enforce this Agreement and recover any incidental damages, or (d) pursue 141
   any other rights or remedies available at law or equity. 142

q. **Professional Advice and Attorneys' Fees.** Buyer and Seller are advised to seek the counsel of an attorney and a 143
certified public accountant to review the terms of this Agreement. Buyer and Seller agree to pay their own fees 144
incurred for such review. However, if Buyer or Seller institutes suit against the other concerning this Agreement the 145
prevailing party is entitled to reasonable attorneys' fees and expenses. 146

r. **Offer.** Buyer agrees to purchase the Property under the terms and conditions of this Agreement. Seller shall have 147
until 9:00 p.m. on the Offer Expiration Date to accept this offer, unless sooner withdrawn. Acceptance shall not be 148
effective until a signed copy is actually received by Buyer, by Selling Licensee or at the licensed office of Selling 149
Licensee. If this offer is not so accepted, it shall lapse and any Earnest Money shall be refunded to Buyer. 150

s. **Counteroffer.** Any change in the terms presented in an offer or counteroffer, other than the insertion of the Seller's 151
name, shall be considered a counteroffer. If a party makes a counteroffer, then the other party shall have until 9:00 152
p.m. on the counteroffer expiration date to accept that counteroffer, unless sooner withdrawn. Acceptance shall not 153
be effective until a signed copy is actually received by Seller, by Listing Agent or at the licensed office of Listing 154
Agent. If the counteroffer is not so accepted, it shall lapse and any Earnest Money shall be refunded to Buyer. 155

t. **Offer and Counteroffer Expiration Date.** If no expiration date is specified for an offer/counteroffer, the offer/ 156
counteroffer shall expire 2 days after the offer/counteroffer is delivered by the party making the offer/counteroffer, 157
unless sooner withdrawn. 158

Initials: BUYER: _____ DATE: 3-19-09 SELLER: _____ DATE: 3-19-09 159
      BUYER: _____ DATE: _____ SELLER: _____ DATE: 3-19-09 160

Form 21
Residential Purchase & Sale Agreement
Revised 1/06
Page 5 of 5

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## RESIDENTIAL REAL ESTATE PURCHASE AND SALE AGREEMENT
### GENERAL TERMS
*(continued)*

u. **Agency Disclosure.** Selling Broker represents the same party that Selling Licensee represents. Listing Broker represents the same party that the Listing Agent represents. If Selling Licensee and Listing Agent are different salespersons affiliated with the same Broker, then both Buyer and Seller confirm their consent to that Broker representing both parties as a dual agent. If Selling Licensee and Listing Agent are the same salesperson representing both parties then both Buyer and Seller confirm their consent to that salesperson and his/her Broker representing both parties as dual agents. All parties acknowledge receipt of the pamphlet entitled "The Law of Real Estate Agency."   181 162 163 164 165 166 167

v. **Commission.** Seller and Buyer agree to pay a commission in accordance with any listing or commission agreement to which they are a party. The Listing Broker's commission shall be apportioned between Listing Broker and Selling Broker as specified in the listing. Seller and Buyer hereby consent to Listing Broker or Selling Broker receiving compensation from more than one party. Seller and Buyer hereby assign to Listing Broker and Selling Broker, as applicable, a portion of their funds in escrow equal to such commission(s) and irrevocably instruct the Closing Agent to disburse the commission(s) directly to the Broker(s). In any action by Listing or Selling Broker to enforce this paragraph, the prevailing party is entitled to court costs and reasonable attorneys' fees. Seller and Buyer agree that the Licensees are intended third party beneficiaries under this Agreement.   168 169 170 171 172 173 174 175

w. **Cancellation Rights/Lead-Based Paint.** If a residential dwelling was built on the Property prior to 1978, and Buyer receives a Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards (NWMLS Form 22J) after mutual acceptance, Buyer may rescind this Agreement at any time up to 3 days thereafter.   176 177 178

x. **Information Verification Period and Property Condition Disclaimer.** Buyer shall have 10 days after mutual acceptance to verify all information provided from Seller or Listing Agent related to the Property. This contingency shall be deemed satisfied unless Buyer gives notice identifying the materially inaccurate information within 10 days of mutual acceptance. If Buyer gives timely notice under this section, then this Agreement shall terminate and the Earnest Money shall be refunded to Buyer. Buyer and Seller agree, that except as provided in this Agreement, all representations and information regarding the Property and the transaction are solely from the Seller or Buyer, and not from any Licensee. The parties acknowledge that the Licensees are not responsible for assuring that the parties perform their obligations under this Agreement and that none of the Licensees have agreed to independently investigate or confirm any matter related to this transaction except as stated in this Agreement, or in a separate writing signed by such Licensee. In addition, Licensees do not guarantee the value, quality or condition of the Property and some properties may contain building materials, including siding, roofing, ceiling, insulation, electrical, and plumbing, that have been the subject of lawsuits and/or governmental inquiry because of possible defects or health hazards. Some properties may have other defects arising after construction, such as drainage, leakage, pest, rot and mold problems. Licensees do not have the expertise to identify or assess defective products, materials, or conditions. Buyer is urged to retain inspectors qualified to identify the presence of defective materials and evaluate the condition of the Property. Licensees may assist the parties with locating and selecting third party service providers, such as inspectors or contractors, but Licensees cannot guarantee or be responsible for the services provided by those third parties. The parties agree to exercise their own judgment and due diligence regarding third party service providers.   179 180 181 182 183 184 185 186 187 188 189 190 191 192 193 194 195 196 197

y. **Disclosures in Form 17.** If Seller provides Buyer with a disclosure statement pursuant to RCW 64.06 (Form 17), Buyer may bring an action in tort to recover economic losses resulting from intentional misrepresentations in Form 17; and if the parties so agree in Specific Term No. 9. Buyer may bring an action in tort to recover economic losses resulting from negligent errors, inaccuracies, or omissions in Form 17. Nevertheless, Buyer is advised to use due diligence to inspect the Property to Buyer's satisfaction, as Seller may not know or have reason to know of defects that careful inspections might reveal. If, in Specific Term No. 9, the parties agree that Buyer will not have a remedy for economic loss resulting from negligent errors, inaccuracies, or omissions in Form 17, then Buyer assumes the risk of economic loss that may result from Seller's negligent misrepresentation in Form 17. Buyer maintains the right to bring any and all claims permitted under the common law, including fraudulent concealment. Buyer and Seller acknowledge that home protection plans may be available which may provide additional protection and benefit to Buyer and Seller.   198 199 200 201 202 203 204 205 206 207 208

Initials: BUYER _____ DATE: 3-19-09   SELLER: _____ DATE: 3-19-09   209
BUYER: _____ DATE _____   SELLER: _____ DATE: 3-19-09   210

Form 34
Addendum/Amendment to P & S
Rev. 5/96
Page 1 of 1

©Copyright 1996
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## ADDENDUM/AMENDMENT TO PURCHASE AND SALE AGREEMENT

The following is part of the Purchase and Sale Agreement dated ___March 19, 2009_____   1

between  IBB & A _____ ("Buyer")   2

and ___Joseph Sellars & Gregory Greene_____ ("Seller")   3

concerning 2525 Center Road, Everett, WA 98204_____ ("the Property")   4

IT IS AGREED BETWEEN THE SELLER AND BUYER AS FOLLOWS:   5

1. Buyer agrees to satisfy seller's existing debt on subject property within 12 months of closing of this   6
transaction.   7
   8

2. Seller agrees to let IBB & A collect rents, deposits, and assume all property management roles.   9
   10

3. Buyer agrees to remain current on existing loan until completely satisfied.   11
   12
   13
   14
   15
   16
   17
   18
   19
   20
   21
   22
   23
   24
   25
   26
   27
   28
   29
   30
   31
   32
   33
   34
   35
   36
   37
   38

ALL OTHER TERMS AND CONDITIONS of said Agreement remain unchanged   41

AGENT (COMPANY) _____   42

BY. _____   43

Initials: BUYER: _____   DATE. 3-19-09   SELLER: _____   DATE: 3-19-09   44
          BUYER: _____   DATE: _____   SELLER: _____   DATE: 3-19-09   45

# Exhibit D

Return Name & Address
17839 1st. Ave. S. #169
Normandy Park, WA. 98148

```
2009040200647                    3    PGS
04/20/2009 2:51pm $44.00
SNOHOMISH COUNTY, WASHINGTON
```

**Document Title(s)**

Memorandum of Contract

**Reference Number(s) of Related Document(s)**

_____                    _____
                                                    Additional Reference #'s on Page____

**Grantor(s)**

Joseph Sellars / Gregory Greene

                                                    _____
                                                    Additional Grantors on Page____

**Grantee(s)**

dba: IBB&A

                                                                                    2
                                                    Additional Grantees on Page____

**Legal Description** (abbreviated form: ie Lot/Block/Plat or Section/Township/Range)

Paine Field 3 BLK 000 D-02 E 85ft TR 162

                                                    Complete Legal on Page____

**Assessor's Property Tax Parcel/Account Number**

# 00538000016202                                                                    2
                                                    Additional Parcel #'s on Page____

The Auditor/Recorder will rely on the information provided on this form. The responsibility for the
accuracy of the indexing information is that of the document preparer

Auxier Financial Group LLC
17837 1ˢᵗ Ave S # 169
Normandy Park, WA 98148
206-551-1786 phone
206-242-3102 fax



# AUXIER FINANCIAL GROUP LLC

## dba International Business Brokers & Affiliates

### Memorandum of Contract

This is a Memorandum of that unrecorded Contract for Sale and Purchase of Property ("Contract"), dated March 19th, 2009, between Joseph Sellars & Gregory Greene. (hereinafter referred to as "Seller"), and Auxier Financial Group LLC dba International Business Brokers & Affiliates, (herein after referred to as "Buyer") concerning the real property 2525 Center Rd, Everett, WA 98204, Snohomish County Parcel # 00538000016202 and Snohomish County Parcel # 00538000016201described in Exhibit "A" attached hereto and made a part hereof by reference

For good and valuable consideration, Seller has agreed to sell and Buyer has agreed to buy the Property upon the terms and conditions set forth in the Contract, which terms and conditions are incorporated in this Memorandum by this reference  Except as provided in the Contract from the date hereof, Seller shall not have the right, with respect to the Property to enter into any new contracts, leases or agreements, oral or written, without the prior written consent of Buyer

This Memorandum is not a complete summary of the Contract  Provisions of this Memorandum shall not be used in interpreting the Contract  In the event of conflict between this Memorandum and the Contract, the Contract shall control

IN WITNESS WHEREOF, the parties have executed this Memorandum on $\underline{4-14-09}$, 20__

Witnesses  SELLER  Joseph Sellars & Gregory Greene

Name ___Joseph Sellars_____ Date ___4-14-09___

Signature _____

Name ___Gregory Greene_____ Date ___4-14-09___

Signature _____

PURCHASER  Auxier Financial Group LLC dba International Business Brokers & Affiliates

Name _____ Date _____

Signature _____

Name _____ Date _____

Signature _____

Auxier Financial Group LLC
17837 1ˢᵗ Ave S # 169
Normandy Park, WA 98148
206-551-1786 phone
206-242-3107 fax



# AUXIER FINANCIAL GROUP LLC
## dba International Business Brokers & Affiliates
## Memorandum of Contract

STATE OF _Wash_ ) COUNTY OF _Snohomish_ ) The foregoing instrument

was acknowledged before me this _4th_ day of _April_ _____ as

Seller

_Elizabeth Maddy_  Notary Public

My Commission Expires _3-29-2010_

STATE OF _____ ) COUNTY OF _____ )

The foregoing instrument was acknowledged before me this ___ day of _____, 20__, by

_____ as Purchaser

_____ Notary Public

My Commission Expires _____

ELIZABETH
NOTARY
PUBLIC
3-29-2010
STATE OF WASHINGTON

Unofficial Document

# Exhibit E



17837 1st Ave S #169 - Normandy Park, WA 98148
Telephone: 206-551-1786 - Fax: 206-242-3102

## Amendment to Purchase & Sales Agreement

Dated **March 11, 2010**

The parties agree to modify and amend the Purchase & Sales Agreement Dated **March 19th, 2009**

between **IBB&A** ("Buyer") and **Joseph Sellars & Gregory Greene** ("Seller") of certain real property commonly known as:

**2525 Center Rd, Everett, WA 98204; Snohomish** County Parcel #(s) **00538000016202** ("Property")

in the following respects. In the event of any disagreements between the terms of this Amendment and the Agreement, this Amendment shall conclusively govern:

1. Purchase Price – To Be Determined by result of final discount and/or workout of encumbrances & liens on title.

2. Terms – Buyer shall pay costs for any Third Parties engaged on Seller's Behalf to assist with facilitation of a Short Sale, Modification, Discount, or other Workout Buyer, in its sole discretion deems appropriate to obtain Reconveyence adequate for Seller to transfer title to buyer.

3. Item #1 on Form 34 of Purchase & Sale shall be modified to read:

    "Buyer Agrees to engage third party to assist with facilitation of workout to obtain Reconveyence by ~~March 31st, 2010.~~" April 31-2011

4. Item #3 on Form 34 of Purchase & Sale is hereby deleted.

5. Closing Date – within 90 days after Buyer's receipt of acceptable workout or filing of Reconveyence of lien recorded on parcel # 00538000016202, Snohomish County document # 200702270788, Lender Washington Mutual Bank, FA as described above, whichever is sooner.

6. Existing Fixtures and Personal Property Included at no monetary value and AS IS with no warranty nor Liens.

7. Seller understands Buyer may assign, lease, and/or resell the property prior to closing.

8. DISTRESSED HOME DISCLOSURE – If the property is a distressed home as defined in RCW 61.34 the parties acknowledge that the Property is a Distressed Home and agree that the Buyer has not provided and will not provide the services of a Distressed Home Consultant to Seller.

Initials
Buyer _____ Date 3-24-10
Buyer _____ Date _____

Seller _____ Date 3-24-10
Seller _____ Date 4-1-10

Page 1 of 2



**IBB&A**
INTERNATIONAL BUSINESS BROKERS & AFFILIATES
I N C O R P O R A T E D

17837 1ᵗ Ave S #169 - Normandy Park, WA 98148
Telephone: 206-551-1786 - Fax: 206-242-3102

7.  Agency Disclosure- IBB&A and/or its affiliates including ACRES has members, who are
    Licensed Real Estate Brokers/Agents, in Washington.  Any Licensees affiliated with IBB&A
    are acting on the company's behalf and are not entering into any agency relationship with
    Seller.

Seller 1 _____ 3-24-10              Seller 2 _____ _____
                                    date                                                 date

Printed name _____                 Printed Name _____

Buyer 1 _____                       
                                    date

Printed Name & Title _____

Initials
Buyer _____ Date 3-24-10                            Seller _____ Date 3-24-10
Buyer _____ Date _____                            Seller _____ Date 4-1-10

Page 2 of 2

# Exhibit F

Form 25
Vacant Land Purchase & Sale
Revised 1/09
Page 1 of 5

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## VACANT LAND PURCHASE AND SALE AGREEMENT
### SPECIFIC TERMS

1. **Date:** March 19, 2009                    **MLS No.:** FSBO
2. **Buyer:** IBB & A
3. **Seller:** LB ENTERPRISES
4. **Property:** Tax Parcel No(s).:00538000016201              (    SNOHOMISH    County)
   Street Address: XXXX CENTER RD. EVERETT                    Washington 98204
   **Legal Description:** Attached as Exhibit A.
5. **Purchase Price:** $31,000.00          Thirty-one thousand dollars
6. **Earnest Money:** (To be held by ☐ Selling Broker; ☐ Closing Agent)
   Personal Check:
   Note:
   Other ( _____ ).
7. **Default:** (check only one) ☐ Forfeiture of Earnest Money; ☐ Seller's Election of Remedies
8. **Disclosures in Form 17 or 17C:** Buyer will ☐ ; will not ☐ have a remedy for Seller's negligent errors, inaccuracies, or omissions in Form 17 or 17C
9. **Title Insurance Company:** Chicago Title                        CHERIE
10. **Closing Agent:** ☐ a qualified closing agent of Buyer's choice; ☑ First Choice Escrow  —(425)268-7175
11. **Closing Date:** 03/27/2009                                     CgoLDSMITH537@MSN.COM
12. **Possession Date:** ☐ on Closing; ☑ Other
13. **Offer Expiration Date:** 03/20/2009
14. **Services of Closing Agent for Payment of Utilities:** ☐ Requested (attach NWMLS Form 22K), ☐ Waived
15. **Charges and Assessments Due After Closing:** ☐ assumed by Buyer; ☐ prepaid in full by Seller at Closing
16. **Subdivision:** The Property ☐ is subdivided; ☐ must be subdivided on or before
    ☐ is not legally required to be subdivided
17. **Feasibility Contingency Expiration Date:** _____ days after mutual acceptance; ☐ Other
18. **Agency Disclosure:** Selling Licensee represents ☐ Buyer; ☐ Seller; ☐ both parties; ☐ neither party
    Listing Agent represents  ☐ Seller; ☐ both parties
19. **Addenda:**

| | | |
|---|---|---|
| _Buyer's Signature_  3-19-09 | _Seller's Signature_  3-19-09 | |
| _Buyer's Signature_  3-19-09 | _Seller's Signature_  3-19-09 | |
| 21029 W. Richmond Rd. | Seller's Address | |
| _City, State, Zip_  Bothell Wa. 98701 | City, State, Zip | |
| _Phone_  423-319-0549        Fax | Phone        Fax | |
| _Buyer's E-mail Address_  neiv7@yahoo.com | Seller's E-mail Address | |
| Selling Broker        MLS Office No. | Listing Broker        MLS Office No. | |
| Selling Licensee (Print)    MLS LAG No. | Listing Agent (Print)    MLS LAG No. | |
| Phone        Fax | Phone        Fax | |

Form 25
Vacant Land Purchase & Sale
Revised 1/09
Page 2 of 5

**VACANT LAND PURCHASE AND SALE AGREEMENT**
**GENERAL TERMS**
*(continued)*

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

**a. Purchase Price.** Buyer agrees to pay to Seller the Purchase Price, including the Earnest Money, in cash at Closing, unless otherwise specified in this Agreement. Buyer represents that Buyer has sufficient funds to close this sale in accordance with this Agreement and is not relying on any contingent source of funds, including funds from loans, the sale of other property, gifts, retirement, or future earnings, except to the extent otherwise specified in this Agreement.  [1] [2] [3] [4]

**b. Earnest Money.** Buyer agrees to deliver the Earnest Money within 2 days after mutual acceptance of this Agreement to Selling Licensee who will deposit any check to be held by Selling Broker, or deliver any Earnest Money to be held by Closing Agent, within 3 days of receipt or mutual acceptance, whichever occurs later. If the Earnest Money is held by Selling Broker and is over $10,000.00 it shall be deposited into an interest bearing trust account in Selling Broker's name provided that Buyer completes an IRS Form W-9. Interest, if any, after deduction of bank charges and fees, will be paid to Buyer. Buyer agrees to reimburse Selling Broker for bank charges and fees in excess of the interest earned, if any. If the Earnest Money held by Selling Broker is over $10,000.00 Buyer has the option to require Selling Broker to deposit the Earnest Money into the Housing Trust Fund Account, with the interest paid to the State Treasurer, if both Seller and Buyer so agree in writing. If the Buyer does not complete an IRS Form W-9 before Selling Broker must deposit the Earnest Money or the Earnest Money is $10,000.00 or less, the Earnest Money shall be deposited into the Housing Trust Fund Account. Selling Broker may transfer the Earnest Money to Closing Agent at Closing. If all or part of the Earnest Money is to be refunded to Buyer and any such costs remain unpaid, the Selling Broker or Closing Agent may deduct and pay them therefrom. The parties instruct Closing Agent to: (1) provide written verification of receipt of the Earnest Money and notice of dishonor of any check to the parties and Licensees at the addresses and/or fax numbers provided herein; and (2) commence an interpleader action in the county in which the Property is located within 30 days of a party's demand for the Earnest Money unless the parties agree otherwise in writing. The parties authorize the party commencing an interpleader action to deduct up to $250.00 for the costs thereof.  [5] [6] [7] [8] [9] [10] [11] [12] [13] [14] [15] [16] [17] [18] [19] [20] [21] [22]

**c. Condition of Title.** Unless otherwise specified in this Agreement, title to the Property shall be marketable at Closing. The following shall not cause the title to be unmarketable: rights, reservations, covenants, conditions and restrictions, presently of record and general to the area; easements and encroachments, not materially affecting the value of or unduly interfering with Buyer's reasonable use of the Property; and reserved oil and/or mining rights. Monetary encumbrances or liens not assumed by Buyer, shall be paid or discharged by Seller on or before Closing. Title shall be conveyed by a Statutory Warranty Deed. If this Agreement is for conveyance of a buyer's interest in a Real Estate Contract, the Statutory Warranty Deed shall include a buyer's assignment of the contract sufficient to convey after acquired title. If the Property has been short platted, the Short Plat number is in the Legal Description.  [23] [24] [25] [26] [27] [28] [29] [30]

**d. Title Insurance.** Seller authorizes Buyer's lender or Closing Agent, at Seller's expense, to apply for the then-current ALTA form of standard form owner's policy of title insurance, with homeowner's additional protection and inflation protection endorsements if available at no additional cost, from the Title Insurance Company. If Seller previously received a preliminary commitment from a Title Insurance Company that Buyer declines to use, Buyer shall pay any cancellation fees owing to the original Title Insurance Company. Otherwise, the party applying for title insurance agrees to pay any title cancellation fee, in the event such a fee is assessed. The Title Insurance Company shall send a copy of the preliminary commitment to Seller, Listing Agent, Buyer and Selling Licensee. The preliminary commitment, and the title policy to be issued, shall contain no exceptions other than the General Exclusions and Exceptions in said standard form and Special Exceptions consistent with the Condition of Title herein provided. If title cannot be made so insurable prior to the Closing Date, then as Buyer's sole and exclusive remedy, the Earnest Money shall, unless Buyer elects to waive such defects or encumbrances, be refunded to the Buyer, less any unpaid costs described in this Agreement, and this Agreement shall thereupon be terminated. Buyer shall have no right to specific performance or damages as a consequence of Seller's inability to provide insurable title.  [31] [32] [33] [34] [35] [36] [37] [38] [39] [40] [41] [42] [43]

**e. Closing and Possession.** This sale shall be closed by the Closing Agent on the Closing Date. "Closing" means the date on which all documents are recorded and the sale proceeds are available to Seller. If the Closing Date falls on a Saturday, Sunday, legal holiday as defined in RCW 1.16.050, or day when the county recording office is closed, the Closing Agent shall close the transaction on the next day that is not a Saturday, Sunday, legal holiday, or day when the county recording office is closed. Buyer shall be entitled to possession at 9:00 p.m. on the Possession Date. Seller agrees to maintain the Property in its present condition, normal wear and tear excepted, until the Buyer is entitled to possession.  [44] [45] [46] [47] [48] [49] [50]

**f. Section 1031 Like-Kind Exchange.** If either Buyer or Seller intends for this transaction to be a part of a Section 1031 like-kind exchange, then the other party agrees to cooperate in the completion of the like-kind exchange so long as the cooperating party incurs no additional liability in doing so, and so long as any expenses (including attorneys' fees and costs) incurred by the cooperating party that are related only to the exchange are paid or reimbursed to the  [51] [52] [53] [54]

Initials: BUYER: _IBPA_ DATE: _3-19-09_ SELLER: _____ DATE: _3-19-09_  [55]

BUYER: _____ DATE: _____ SELLER: _____ DATE: _3-19-09_  [56]

Form 25
Vacant Land Purchase & Sale
Revised 1/09
Page 3 of 5

**VACANT LAND PURCHASE AND SALE AGREEMENT**
**GENERAL TERMS**
(continued)

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

cooperating party at or prior to Closing. Notwithstanding the Assignment paragraph of this Agreement, any party 57
completing a Section 1031 like-kind exchange may assign this Agreement to its qualified intermediary or any entity 58
set up for the purposes of completing a reverse exchange. 59

g. **Closing Costs and Prorations and Charges and Assessments.** Seller and Buyer shall each pay one-half of the 60
escrow fee unless otherwise required by applicable FHA or VA regulations. Taxes for the current year, rent, interest, 61
and lienable homeowner's association dues shall be prorated as of Closing. Buyer agrees to pay Buyer's loan costs, 62
including credit report, appraisal charge and lender's title insurance, unless provided otherwise in this Agreement. If 63
any payments are delinquent on encumbrances which will remain after Closing, Closing Agent is instructed to pay 64
such delinquencies at Closing from money due, or to be paid by, Seller. Buyer agrees to pay for remaining fuel in the 65
fuel tank if, prior to Closing, Seller obtains a written statement as to the quantity and current price from the supplier. 66
Seller agrees to pay all utility charges, including unbilled charges. Unless waived in Specific Term No. 14, Seller and 67
Buyer request the services of Closing Agent in disbursing funds necessary to satisfy unpaid utility charges in 68
accordance with RCW 60.80 and Seller agrees to provide the names and addresses of all utilities providing service to 69
the Property and having lien rights (attach NWMLS Form 22K Identification of Utilities or equivalent). Buyer is advised 70
to verify the existence and amount of any local improvement district, capacity or impact charges or other assessments 71
that may be charged against the Property before or after Closing. Seller will pay such charges that are encumbrances 72
at the time of Closing, or that are or become due on or before Closing. Charges levied before Closing, but becoming 73
due after Closing shall be paid as agreed in Specific Term No. 15. 74

h. **Sale Information.** The Listing Agent or Selling Licensee is authorized to report this Agreement (including price and all 75
terms) to the Multiple Listing Service that published it and to its members, financing institutions, appraisers, and 76
anyone else related to this sale. Buyer and Seller expressly authorize all Closing Agents, appraisers, title insurance 77
companies, and others related to this Sale, to furnish the Listing Agent and/or Selling Licensee, on request, any and 78
all information and copies of documents concerning this sale. 79

i. **FIRPTA - Tax Withholding at Closing.** The Closing Agent is instructed to prepare a certification (NWMLS Form 22E 80
or equivalent) that Seller is not a "foreign person" within the meaning of the Foreign Investment In Real Property Tax 81
Act. Seller agrees to sign this certification. If Seller is a foreign person, and this transaction is not otherwise exempt 82
from FIRPTA, Closing Agent is instructed to withhold and pay the required amount to the Internal Revenue Service. 83

j. **Notices.** In consideration of the license to use this and NWMLS's companion forms and for the benefit of the Listing 84
Agent and the Selling Licensee as well as the orderly administration of the offer, counteroffer or this agreement, the 85
parties irrevocably agree that unless otherwise specified in this Agreement, any notice required or permitted in, or 86
related to, this Agreement (including revocations of offers or counteroffers) must be in writing. Notices to Seller must 87
be signed by at least one Buyer and shall be deemed given only when the notice is received by Seller, by Listing 88
Agent or at the licensed office of Listing Agent. Notices to Buyer must be signed by at least one Seller and shall be 89
deemed given only when the notice is received by Buyer, by Selling Licensee or at the licensed office of Selling 90
Licensee. Actual receipt by Selling Licensee of a Form 17 or 17C (whichever is applicable), Public Offering 91
Statement or Resale Certificate, homeowners' association documents provided pursuant to NWMLS Form 22D, or a 92
preliminary commitment for title insurance provided pursuant to NWMLS Form 22T shall be deemed receipt by 93
Buyer. Selling Licensee and Listing Agent have no responsibility to advise of receipt of a notice beyond either 94
phoning the party or causing a copy of the notice to be delivered to the party's address shown on this Agreement. 95
Buyer and Seller must keep Selling Licensee and Listing Agent advised of their whereabouts in order to receive 96
prompt notification of receipt of a notice. 97

k. **Computation of Time.** Unless otherwise specified in this Agreement, any period of time measured in days and stated 98
in this Agreement shall start on the day following the event commencing the period and shall expire at 9:00 p.m. of the 99
last calendar day of the specified period of time. Except for the Possession Date, if the last day is a Saturday, Sunday 100
or legal holiday as defined in RCW 1.16.050, the specified period of time shall expire on the next day that is not a 101
Saturday, Sunday or legal holiday. Any specified period of 5 days or less shall not include Saturdays, Sundays or 102
legal holidays. If the parties agree that an event will occur on a specific calendar date, the event shall occur on that 103
date, except for the Closing Date, which, if it falls on a Saturday, Sunday, legal holiday as defined in RCW 1.16.050, 104
or day when the county recording office is closed, shall occur on the next day that is not a Saturday, Sunday, legal 105
holiday, or day when the county recording office is closed. If the parties agree upon and attach a legal description 106
after this Agreement is signed by the offeree and delivered to the offeror, then for the purposes of computing time, 107
mutual acceptance shall be deemed to be on the date of delivery of an accepted offer or counteroffer to the offeror, 108
rather than on the date the legal description is attached. Time is of the essence of this Agreement. 109

Initials: BUYER: _BB+A_ DATE: _3-19-09_ SELLER: _____ DATE: _3-19-09_ 110
         BUYER: _____ DATE: _____ SELLER: _____ DATE: _3-19-09_ 111

Form 25
Vacant Land Purchase & Sale
Revised 1/09
Page 4 of 5

**VACANT LAND PURCHASE AND SALE AGREEMENT**
**GENERAL TERMS**
*(continued)*

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

l.  **Facsimile or E-mail Transmission.** Facsimile transmission of any signed original document, and retransmission of any signed facsimile transmission, shall be the same as delivery of an original. At the request of either party, or the Closing Agent, the parties will confirm facsimile transmitted signatures by signing an original document. E-mail transmission of any document or notice shall not be effective unless the parties to this Agreement otherwise agree in writing

m.  **Integration.** This Agreement constitutes the entire understanding between the parties and supersedes all prior or contemporaneous understandings and representations. No modification of this Agreement shall be effective unless agreed in writing and signed by Buyer and Seller.

n.  **Assignment.** Buyer may not assign this Agreement, or Buyer's rights hereunder, without Seller's prior written consent, unless the parties indicate that assignment is permitted by the addition of "and/or assigns" on the line identifying the Buyer on the first page of this Agreement.

o.  **Default.** In the event Buyer fails, without legal excuse, to complete the purchase of the Property, then the following provision, as identified in Specific Term No. 7, shall apply:

   i.  **Forfeiture of Earnest Money.** That portion of the Earnest Money that does not exceed five percent (5%) of the Purchase Price shall be forfeited to the Seller as the sole and exclusive remedy available to Seller for such failure.

   ii.  **Seller's Election of Remedies.** Seller may, at Seller's option, (a) keep the Earnest Money as liquidated damages as the sole and exclusive remedy available to Seller for such failure, (b) bring suit against Buyer for Seller's actual damages, (c) bring suit to specifically enforce this Agreement and recover any incidental damages, or (d) pursue any other rights or remedies available at law or equity.

p.  **Professional Advice and Attorneys' Fees.** Buyer and Seller are advised to seek the counsel of an attorney and a certified public accountant to review the terms of this Agreement. Buyer and Seller agree to pay their own fees incurred for such review. However, if Buyer or Seller institutes suit against the other concerning this Agreement the prevailing party is entitled to reasonable attorneys' fees and expenses.

q.  **Offer.** Buyer agrees to purchase the Property under the terms and conditions of this Agreement. Seller shall have until 9:00 p.m. on the Offer Expiration Date to accept this offer, unless sooner withdrawn. Acceptance shall not be effective until a signed copy is actually received by Buyer, by Selling Licensee or at the licensed office of Selling Licensee. If this offer is not so accepted, it shall lapse and any Earnest Money shall be refunded to Buyer.

r.  **Counteroffer.** Any change in the terms presented in an offer or counteroffer, other than the insertion of the Seller's name, shall be considered a counteroffer. If a party makes a counteroffer, then the other party shall have until 9:00 p.m. on the counteroffer expiration date to accept that counteroffer, unless sooner withdrawn. Acceptance shall not be effective until a signed copy is actually received by Seller, by Listing Agent or at the licensed office of Listing Agent. If the counteroffer is not so accepted, it shall lapse and any Earnest Money shall be refunded to Buyer.

s.  **Offer and Counteroffer Expiration Date.** If no expiration date is specified for an offer/counteroffer, the offer/counteroffer shall expire 2 days after the offer/counteroffer is delivered by the party making the offer/counteroffer, unless sooner withdrawn.

t.  **Agency Disclosure.** Selling Broker represents the same party that Selling Licensee represents. Listing Broker represents the same party that the Listing Agent represents. If Selling Licensee and Listing Agent are different salespersons affiliated with the same Broker, then both Buyer and Seller confirm their consent to that Broker representing both parties as a dual agent. If Selling Licensee and Listing Agent are the same salesperson representing both parties then both Buyer and Seller confirm their consent to that salesperson and his/her Broker representing both parties as dual agents. All parties acknowledge receipt of the pamphlet entitled "The Law of Real Estate Agency."

u.  **Commission.** Seller and Buyer agree to pay a commission in accordance with any listing or commission agreement to which they are a party. The Listing Broker's commission shall be apportioned between Listing Broker and Selling Broker as specified in the listing. Seller and Buyer hereby consent to Listing Broker or Selling Broker receiving compensation from more than one party. Seller and Buyer hereby assign to Listing Broker and Selling Broker, as applicable, a portion of their funds in escrow equal to such commission(s) and irrevocably instruct the Closing Agent to disburse the commission(s) directly to the Broker(s). In any action by Listing or Selling Broker to enforce this paragraph, the prevailing party is entitled to court costs and reasonable attorneys' fees. Seller and Buyer agree that the Licensees are intended third party beneficiaries under this Agreement.

Initials: BUYER: _____ DATE: 3-19-09 SELLER: _____ DATE: 3-19-09

     BUYER: _____ DATE: _____ SELLER: _____ DATE: 3-19-09

Form 25
Vacant Land Purchase & Sale
Revised 1/09
Page 5 of 5

**VACANT LAND PURCHASE AND SALE AGREEMENT**
**GENERAL TERMS**

©Copyright 2009
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

**v. Feasibility Contingency.** It is the Buyer's responsibility to verify before the Feasibility Contingency Expiration Date   163
identified in Specific Term No. 17 whether or not the Property can be platted, developed and/or built on (now or in   164
the future) and what it will cost to do this. BUYER SHOULD NOT RELY ON ANY ORAL STATEMENTS concerning   165
this made by the Seller, Listing Agent or Selling Licensee. Buyer should inquire at the city or county, and water,   166
sewer or other special districts in which the Property is located. Buyer's inquiry should include, but not be limited to:   167
building or development moratoriums applicable to or being considered for the Property; any special building   168
requirements, including setbacks, height limits or restrictions on where buildings may be constructed on the   169
Property; whether the Property is affected by a flood zone, wetlands, shorelands or other environmentally sensitive   170
area; road, school, fire and any other growth mitigation or impact fees that must be paid; the procedure and length of   171
time necessary to obtain plat approval and/or a building permit; sufficient water, sewer and utility and any service   172
connection charges; and all other charges that must be paid. Buyer and Buyer's agents, representatives,   173
consultants, architects and engineers shall have the right, from time to time during the feasibility contingency, to   174
enter onto the Property and to conduct any tests or studies that Buyer may need to ascertain the condition and   175
suitability of the Property for Buyer's intended purpose. Buyer shall restore the Property and all improvements on the   176
Property to the same condition they were in prior to the inspection. Buyer shall be responsible for all damages   177
resulting from any inspection of the Property performed on Buyer's behalf. If the Buyer does not give notice to the   178
contrary on or before the Feasibility Contingency Expiration Date identified in Specific Term No. 17, it shall be   179
conclusively deemed that Buyer is satisfied as to development and/or construction feasibility and cost. If Buyer gives   180
notice this Agreement shall terminate and the Earnest Money shall be refunded to Buyer, less any unpaid costs.   181

**w. Subdivision.** If the Property must be subdivided, Seller represents that there has been preliminary plat approval for   182
the Property and this Agreement is conditioned on the recording of the final plat containing the Property on or before   183
the date specified in Specific Term 16. If the final plat is not recorded by such date, this Agreement shall terminate   184
and the Earnest Money shall be refunded to Buyer.   185

**x. Information Verification Period and Property Condition Disclaimer.** Buyer shall have 10 days after mutual   186
acceptance to verify all information provided from Seller or Listing Agent related to the Property. This contingency   187
shall be deemed satisfied unless Buyer gives notice identifying the materially inaccurate information within 10 days   188
of mutual acceptance. If Buyer gives timely notice under this section, then this Agreement shall terminate and the   189
Earnest Money shall be refunded to Buyer. Buyer and Seller agree, that except as provided in this Agreement, all   190
representations and information regarding the Property and the transaction are solely from the Seller or Buyer, and   191
not from any Licensee. The parties acknowledge that the Licensees are not responsible for assuring that the parties   192
perform their obligations under this Agreement and that none of the Licensees have agreed to independently   193
investigate or confirm any matter related to this transaction except as stated in this Agreement, or in a separate   194
writing signed by such Licensee. In addition, Licensees do not guarantee the value, quality or condition of the   195
Property and some properties may contain building materials, including siding, roofing, ceiling, insulation, electrical,   196
and plumbing, that have been the subject of lawsuits and/or governmental inquiry because of possible defects or   197
health hazards. Some properties may have other defects arising after construction, such as drainage, leakage, pest,   198
rot and mold problems. Licensees do not have the expertise to identify or assess defective products, materials, or   199
conditions. Buyer is urged to retain inspectors qualified to identify the presence of defective materials and evaluate   200
the condition of the Property. Licensees may assist the parties with locating and selecting third party service   201
providers, such as inspectors or contractors, but Licensees cannot guarantee or be responsible for the services   202
provided by those third parties. The parties agree to exercise their own judgment and due diligence regarding third   203
party service providers.   204

**y. Disclosures in Form 17 or 17C.** If Seller provides Buyer with a disclosure statement pursuant to RCW 64.06 (Form   205
17 or 17C, whichever is applicable), Buyer may bring an action in tort to recover economic losses resulting from   206
intentional misrepresentations in Form 17 or 17C; and if the parties so agree in Specific Term No. 8, Buyer may   207
bring an action in tort to recover economic losses resulting from negligent errors, inaccuracies, or omissions in Form   208
17 or 17C. Nevertheless, Buyer is advised to use due diligence to inspect the Property to Buyer's satisfaction, as   209
Seller may not know or have reason to know of defects that careful inspections might reveal. If, in Specific Term No.   210
8, the parties agree that Buyer will not have a remedy for economic loss resulting from negligent errors,   211
inaccuracies, or omissions in Form 17 or 17C, then Buyer assumes the risk of economic loss that may result from   212
Seller's negligent misrepresentation in Form 17 or 17C. Buyer maintains the right to bring any and all claims   213
permitted under the common law, including fraudulent concealment. Buyer and Seller acknowledge that home   214
protection plans may be available which may provide additional protection and benefit to Buyer and Seller.   215

Initials: BUYER: BB+A   DATE: 3-19-09   SELLER: _____ DATE: 3-19-09   216
BUYER: _____   DATE: _____   SELLER: _____ DATE: 3-19-09   217

Form 34
Addendum/Amendment to P & S
Rev. 5/96
Page 1 of 1

©Copyright 1996
Northwest Multiple Listing Service
ALL RIGHTS RESERVED

## ADDENDUM/AMENDMENT TO PURCHASE AND SALE AGREEMENT

The following is part of the Purchase and Sale Agreement dated ___March 19, 2009___ 1

between IBB & A _____ ("Buyer") 2

and____ LB Enterprises _____ ("Seller") 3

concerning XXXX Center Road, Everett, WA 98204 _____ ("the Property") 4

IT IS AGREED BETWEEN THE SELLER AND BUYER AS FOLLOWS: 5

1. This transaction is subject to the completed transaction of the adjacent parcel 00538000016202, dated 6
3/19/09. Should that transaction not close within 12 months from today, this transaction is also void. 7

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38

ALL OTHER TERMS AND CONDITIONS of said Agreement remain unchanged.

AGENT (COMPANY) _____ 41

BY: _____ 42

43

Initials: BUYER: _____ DATE: 3-19-09 SELLER: _____ DATE: 3-19-09 44
        BUYER: _____ DATE: _____ SELLER: _____ DATE: 3-19-09 45

# Exhibit G

222013

After Recording Return to:

Filed for Record at the request of:

1st Choice Escrow
12611 8th Ave West, Suite A-202
Everett, WA 98204



2009032903050          1    PG
03/23/2009 1:58pm $42.00
SNOHOMISH COUNTY, WASHINGTON

No. 4898386  3/23/2009 1:58 PM
Thank you for your payment.
GERI

628.00

# Statutory Warranty Deed

THE GRANTOR Land barons, LLC a Washington Limited Liability Company dba LB
Enterprises for and in consideration of *Ten Dollars ($10.00)* and other good and valuable
consideration
in hand paid, conveys and warrants to Auxier Financial Group LLC, dba **International
Business Brokers & Affiliates**

the following described real estate:
The land referred to is situated in the unincorporated area of the County of Snohomish, State
of Washington,
Tract(s0 162, Plat of Paine Field No. 3, according to the plat thereof recorded in Volume 12 of
Plats, Page(s) 110-111, records of Snohomish County, Washington Except the East 85 feet
thereof.
Situate in the County of Snohomish, State of Washington
Subject to: easements, covenants, conditions, restrictions, and reservations of record.

Assessor's Tax Parcel ID# 005380-000-162-01   FIRST AMERICAN 1375754
1/43
Dated: 3/22/09

_____          _____
LB Enterprises BY Joseph T Sellars          LB Enterprises BY Greg Greene

State of Washington
County of Snohomish

**On this day personally appeared before me Joseph T Sellars and Greg Greene me
known to be the individual(s) described in and who executed the within and foregoing
instrument, and acknowledged that They signed the same as Their free and voluntary
act and deed, for the uses and purposes therein mentioned.**

GIVEN under my hand and official seal this _____ 22 _____ day of March 2009

Notary Seal

_____
Cherie L Goldsmith
Notary Public in and for the State of Washington
residing At Everett
My commission expires:  May 9, 2010

# Exhibit H

ELECTRONICALLY RECORDED
200905260335                     4
05/26/2009 10:11 AM          46.00
SNOHOMISH COUNTY, WASHINGTON

When recorded return to:

William F. Walker
19214 40th Ave W
Lynnwood, WA 98036

Filed for Record at Request of
Pacific NorthWest Escrow Corporation
Escrow Number: P7859

# DEED OF TRUST
*(For use in the State of Washington only)*

THIS DEED OF TRUST, made this 21st day of May, 2009 between Auxier Financial Group LLC, dba International Business Brokers & Affiliates, a Washington Limited Liability Company**Auxier Financial Group LLC, dba International Business Brokers & Affiliates, a Washington Corporation**, GRANTOR , whose address is 17837 1st. Ave. S., #169, Normandy Park, WA 98148, and , First American Title Company, TRUSTEE, whose address is 2917 Pacific Avenue     , Everett, WA 98201 and William F. Walker, BENEFICIARY, whose address is 19214 40th Ave W  , Lynnwood, WA 98036.

WITNESSETH:  Grantor hereby bargains, sells, and conveys to Trustee in trust, with power of sale, the following described real property in Snohomish County, Washington:

Abbreviated Legal:

Portion of Tract 162, Plat of Paine Field No. 3, Volume 12, Pages 110 and 111.
Snohomish County.
For Full Legal See Attached Exhibit "A"

Tax Parcel Number(s): 005380-000-162-01          FIRST AMERICAN 1416277
4147

which real property is not used principally for agricultural purposes, together with all the tenements, hereditaments, and appurtenances now or hereafter thereunto belonging or in any wise appertaining, and the rents, issues, and profits of the property.

This Deed of Trust is for the purpose of securing performance of each agreement of Grantor  herein contained in this Deed of Trust, and payment of the sum of **SIXTY FIVE THOUSAND  AND NO/100 Dollars ($65,000.00)** with interest, in accordance with the terms of a promissory note of even date herewith, payable to Beneficiary or order, and made by Grantor, and all renewals, modifications, and extensions of the note, and also such further sums as may be advanced or loaned by Beneficiary to Grantor , or any of the Grantor 's successors or assigns, together with interest thereon at the rate agreed upon.

**DUE DATE:**  The entire balance of the promissory note secured by this Deed of Trust, together with any and all interest accrued thereon, shall be due and payable in full on  August 22, 2009.

To protect the security of this Deed of Trust, Grantor  covenants and agrees:

1.  To keep the property in good condition and repair; to permit no waste of the property; to complete any building, structure, or improvement being built or about to be built on the property; to restore promptly any building, structure, or improvement on the property which may be damaged or destroyed; and to comply with all laws, ordinances, regulations, covenants, conditions, and restrictions affecting the property.

2.  To pay before delinquent all lawful taxes and assessments upon the property; to keep the property free and clear of all other charges, liens, or encumbrances impairing the security of this Deed of Trust.

3.  To keep all buildings now or hereafter erected on the property continuously insured against loss by fire or other hazards in an amount not less than the total debt secured by this Deed of Trust.  All policies shall be held by the Beneficiary, and be in such companies as the Beneficiary may approve and have loss payable first to the Beneficiary, as its interest may appear, and then to the Grantor .  The amount collected under any insurance policy may be applied upon any indebtedness secured by this Deed of Trust in such order as the Beneficiary shall determine.  Such application by the Beneficiary shall not cause discontinuance of any proceedings to foreclose this Deed of Trust.  In the event of foreclosure, all rights of the Grantor  in insurance policies then in force shall pass to the purchaser at the foreclosure sale.

LPB 22A(i-I)
Page 1 of 4

4.  To defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee, and to pay all costs and expenses, including cost of title search and attorney's fees in a reasonable amount, in any such action or proceeding, and in any suit brought by Beneficiary to foreclose this Deed of Trust.

5.  To pay all costs, fees, and expenses in connection with this Deed of Trust, including the expenses of the Trustee incurred in enforcing the obligation secured by this Deed of Trust and Trustee's and attorney's fees actually incurred, as provided by statute.

6.  Should Grantor fail to pay when due any taxes, assessments, insurance premiums, liens, encumbrances, or other charges against the property. Beneficiary may pay the same, and the amount so paid, with interest at the rate set forth in the note secured by this Deed of Trust, shall be added to and become a part of the debt secured in this Deed of Trust.

7.  DUE ON SALE: (OPTIONAL – *Not applicable unless initialed by Grantor and Beneficiary*) The property described in this security instrument may not be sold or transferred without the Beneficiary's consent. Upon breach of this provision, Beneficiary may declare all sums due under the note and Deed of Trust immediately due and payable, unless prohibited by applicable law.

_____                    _____
Grantor (Initials)                                      Beneficiary (Initials)

IT IS MUTUALLY AGREED THAT:

8.  In the event any portion of the property is taken or damaged in an eminent domain proceeding, the entire amount of the award or such portion as may be necessary to fully satisfy the obligation secured by this Deed of Trust shall be paid to Beneficiary to be applied to said obligation.

9.  By accepting payment of any sum secured by this Deed of Trust after its due date, Beneficiary does not waive its right to require prompt payment when due of all other sums so secured or to declare default for failure to so pay.

10. The Trustee shall reconvey all or any part of the property covered by this Deed of Trust to the person entitled thereto, on written request of the Grantor and the Beneficiary, or upon satisfaction of the obligation secured and written request for reconveyance made by the Beneficiary or the person entitled thereto.

11. Upon default by Grantor in the payment of any indebtedness secured by this Deed of Trust or in the performance of any agreement contained in this Deed of Trust, all sums secured by this Deed of Trust shall immediately become due and payable at the option of the Beneficiary, subject to any cure period provided in the note secured by this Deed of Trust. In such event and upon written request of Beneficiary, Trustee shall sell the trust property, in accordance with the Deed of Trust Act of the State of Washington, at public auction to the highest bidder. Any person except Trustee may bid at Trustee's sale. Trustee shall apply the proceeds of the sale as follows: (1) to the expense of the sale, including a reasonable Trustee's fee and attorney's fee; (2) to the obligation secured by this Deed of Trust; and (3) the surplus, if any, shall be distributed to the persons entitled thereto.

12. Trustee shall deliver to the purchaser at the sale its deed, without warranty, which shall convey to the purchaser all right, title and interest in the real and personal property which Grantor had or had the power to convey at the time of the execution of this Deed of Trust, and such as Grantor may have acquired thereafter. Trustee's deed shall recite the facts showing that the sale was conducted in compliance with all the requirements of law and of this Deed of Trust, which recital shall be prima facie evidence of such compliance and conclusive evidence thereof in favor of bona fide purchaser and encumbrances for value.

13. The power of sale conferred by this Deed of Trust and by the Deed of Trust Act of the State of Washington is not an exclusive remedy; Beneficiary may cause this Deed of Trust to be foreclosed as a mortgage.

14. In the event of the absence, death, incapacity, disability, or resignation of Trustee, or at the discretion of the Beneficiary, Beneficiary may appoint in writing a successor trustee, and upon the recording of such appointment in the mortgage records of the county in which this Deed of Trust is recorded, the successor trustee shall be vested with all powers of the original trustee. The trustee is not obligated to notify any party hereto of pending sale under any other Deed of Trust or of an action or proceeding in which Grantor, Trustee, or Beneficiary shall be a party unless such action or proceeding is brought by the Trustee.

15. This Deed of Trust applies to, inures to the benefit of, and is binding not only on the parties hereto, but on his/her/their heirs, devisees, legatees, administrators, executors, and assigns. The term Beneficiary shall mean the holder and owner of the note secured hereby, whether or not named as Beneficiary herein.

16. ADDITIONAL TERMS AND CONDITIONS: (check one)

    a.   ☒   NONE

    OR

b. ☐   As set forth on the attached "Exhibit A" which is incorporated by this reference.

(Note:  If neither "a" nor "b" is checked, then option "a" applies)

Dated:  May 21, 2009

Auxier Financial Group LLC, dba International
Business Brokers & Affiliates

By: _____
    Heidi Brown-Velez, Authorized Signor


STATE OF  Washington _____ }
COUNTY OF Snohomish _____ } SS:

I certify that I know or have satisfactory evidence that

the person  who appeared before me, and said person acknowledged that Heidi  Brown-Velez
signed this instrument and acknowledge it to be _____ her _____ free and voluntary act for the uses
and purposes mentioned in this instrument, as the   Authorized signor
of Auxier Financial Group, LLC, dba International Business Brokers & Affiliates.

Dated:  May  21, 2009 _____   _____
                                     Steven P. Barrett
                                     Notary Public in and for the State of  Washington
                                     Residing at:   Edmonds _____
                                     My appointment expires:   9/15/2011 _____

## REQUEST FOR FULL RECONVEYANCE

*Do not record.  To be used only when note has been paid.*

**TO:  TRUSTEE**

The undersigned is the legal owner and holder of the note and all other indebtedness secured by the within Deed
of Trust.  Said note, together with all other indebtedness secured by said Deed of Trust, has been fully paid and
satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms
of said Deed of Trust, to cancel said note above mentioned; and all other evidences of indebtedness secured by
said Deed of Trust delivered to you herewith, together with the said Deed of Trust, and to reconvey, without
warranty, to the parties designated by the terms of said Deed of Trust, all the estate now held by you thereunder.

Dated _____ , _____

_____

_____

_____

**Exhibit "A"**

Tract 162, Plat of Paine Field No. 3, according to the plat thereof recorded in Volume 12 of Plats, pages 110 and 111, records of  Snohomish County, Washington;
EXCEPT the East 85 feet thereof.

LPB 22-05(i-l)
Page 4 of 4